# EXHIBIT A

**SUMMONS - CIVIL**
JD-CV-1   Rev. 2-22
C.G.S. §§ 51-346, 51-347, 51-349, 51-350, 52-45a, 52-48, 52-259;
P.B. §§ 3-1 through 3-21, 8-1, 10-13

| For Information on ADA accommodations, contact a court clerk or go to: www.jud.ct.gov/ADA. | STATE OF CONNECTICUT SUPERIOR COURT www.jud.ct.gov |
|---|---|

**Instructions are on page 2.**

☐ Select if amount, legal interest, or property in demand, not including interest and costs, is LESS than $2,500.

☒ Select if amount, legal interest, or property in demand, not including interest and costs, is $2,500 or MORE.

☐ Select if claiming other relief in addition to, or in place of, money or damages.

**TO: Any proper officer**
By authority of the State of Connecticut, you are hereby commanded to make due and legal service of this summons and attached complaint.

| Address of court clerk (Number, street, town and zip code) 123 Hoyt Street, Stamford, CT 06905 | Telephone number of clerk ( 203 ) 965 – 5308 | Return Date (Must be a Tuesday) 05/10/2022 |
|---|---|---|

| ☒ Judicial District | G.A. | At (City/Town) | Case type code (See list on page 2) |
| ☐ Housing Session | ☐ Number: | Stamford | Major: C    Minor: 90 |

**For the plaintiff(s) enter the appearance of:**

| Name and address of attorney, law firm or plaintiff if self-represented (Number, street, town and zip code) Amos Friedland | Roche Freedman LLP, 99 Park Avenue, Suite 1910, New York, NY 10016 | Juris number (if attorney or law firm) 429133 |
|---|---|

| Telephone number ( 646 ) 970 – 7519 | Signature of plaintiff (if self-represented) |
|---|---|

| The attorney or law firm appearing for the plaintiff, or the plaintiff if self-represented, agrees to accept papers (service) electronically in this case under Section 10-13 of the Connecticut Practice Book. ☒ Yes ☐ No | E-mail address for delivery of papers under Section 10-13 of the Connecticut Practice Book (if agreed) afriedland@rochefreedman.com |
|---|---|

| Parties | Name (Last, First, Middle Initial) and address of each party (Number; street; P.O. Box; town; state; zip; country, if not USA) | |
|---|---|---|
| First plaintiff | Name: BBSR, LLC Address: 100 Imperial Avenue, Westport, CT 06880 | P-01 |
| Additional plaintiff | Name: Address: | P-02 |
| First defendant | Name: Anheuser-Busch, LLC Address: 1 Busch Place, St. Louis, MO 63118 | D-01 |
| Additional defendant | Name: Address: | D-02 |
| Additional defendant | Name: Address: | D-03 |
| Additional defendant | Name: Address: | D-04 |

| Total number of plaintiffs: 1 | Total number of defendants: 1 | ☐ Form JD-CV-2 attached for additional parties |
|---|---|---|

**Notice to each defendant**

1. **You are being sued.** This is a summons in a lawsuit. The complaint attached states the claims the plaintiff is making against you.
2. To receive further notices, you or your attorney must file an *Appearance* (form JD-CL-12) with the clerk at the address above. Generally, it must be filed on or before the second day after the Return Date. The Return Date is not a hearing date. You do not have to come to court on the Return Date unless you receive a separate notice telling you to appear.
3. If you or your attorney do not file an *Appearance* on time, a default judgment may be entered against you. You can get an *Appearance* form at the court address above, or on-line at https://jud.ct.gov/webforms/.
4. If you believe that you have insurance that may cover the claim being made against you in this lawsuit, you should immediately contact your insurance representative. Other actions you may take are described in the Connecticut Practice Book, which may be found in a superior court law library or on-line at https://www.jud.ct.gov/pb.htm.
5. If you have questions about the summons and complaint, you should talk to an attorney.
   The court staff is not allowed to give advice on legal matters.

| Date 03/08/2022 | Signed (Sign and select proper box) Amos Friedland | ☐ Commissioner of Superior Court ☐ Clerk | Name of person signing |
|---|---|---|---|

If this summons is signed by a Clerk:
a. The signing has been done so that the plaintiff(s) will not be denied access to the courts.
b. It is the responsibility of the plaintiff(s) to ensure that service is made in the manner provided by law.
c. The court staff is not permitted to give any legal advice in connection with any lawsuit.
d. The Clerk signing this summons at the request of the plaintiff(s) is not responsible in any way for any errors or omissions in the summons, any allegations contained in the complaint, or the service of the summons or complaint.

| For Court Use Only File Date |
|---|

| I certify I have read and understand the above: | Signed (Self-represented plaintiff) | Date | Docket Number |
|---|---|---|---|

| Print Form | Page 1 of 2 | Reset Form |
|---|---|---|

## Instructions

1. *Type or print legibly.* If you are a self-represented party, this summons must be signed by a clerk of the court.

2. If there is more than one defendant, make a copy of the summons for each additional defendant. Each defendant must receive a copy of this summons. Each copy of the summons must show who signed the summons and when it was signed. If there are more than two plaintiffs or more than four defendants, complete the Civil Summons Continuation of Parties (form JD-CV-2) and attach it to the original and all copies of the summons.

3. Attach the summons to the complaint, and attach a copy of the summons to each copy of the complaint. Include a copy of the Civil Summons Continuation of Parties form, if applicable.

4. After service has been made by a proper officer, file the original papers and the officer's return of service with the clerk of the court.

5. Use this summons for the case type codes shown below.

   Do not use this summons for the following actions:

   (a) Family matters (for example divorce, child support, custody, parentage, and visitation matters)
   (b) Any actions or proceedings in which an attachment, garnishment or replevy is sought
   (c) Applications for change of name
   (d) Probate appeals

   (e) Administrative appeals
   (f) Proceedings pertaining to arbitration
   (g) Summary Process (Eviction) actions
   (h) Entry and Detainer proceedings
   (i) Housing Code Enforcement actions

## Case Type Codes

| MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION | MAJOR DESCRIPTION | CODE Major/ Minor | MINOR DESCRIPTION |
|---|---|---|---|---|---|
| Contracts | C 00 | Construction - All other | Property | P 00 | Foreclosure |
| | C 10 | Construction - State and Local | | P 10 | Partition |
| | C 20 | Insurance Policy | | P 20 | Quiet Title/Discharge of Mortgage or Lien |
| | C 30 | Specific Performance | | P 30 | Asset Forfeiture |
| | C 40 | Collections | | P 90 | All other |
| | C 50 | Uninsured/Underinsured Motorist Coverage | | | |
| | C 60 | Uniform Limited Liability Company Act – C.G.S. 34-243 | Torts (Other than Vehicular) | T 02 | Defective Premises - Private - Snow or Ice |
| | C 90 | All other | | T 03 | Defective Premises - Private - Other |
| Eminent Domain | E 00 | State Highway Condemnation | | T 11 | Defective Premises - Public - Snow or Ice |
| | E 10 | Redevelopment Condemnation | | T 12 | Defective Premises - Public - Other |
| | E 20 | Other State or Municipal Agencies | | T 20 | Products Liability - Other than Vehicular |
| | E 30 | Public Utilities & Gas Transmission Companies | | T 28 | Malpractice - Medical |
| | E 90 | All other | | T 29 | Malpractice - Legal |
| | | | | T 30 | Malpractice - All other |
| Housing | H 10 | Housing - Return of Security Deposit | | T 40 | Assault and Battery |
| | H 12 | Housing - Rent and/or Damages | | T 50 | Defamation |
| | H 40 | Housing - Housing - Audita Querela/Injunction | | T 61 | Animals - Dog |
| | H 50 | Housing - Administrative Appeal | | T 69 | Animals - Other |
| | H 60 | Housing - Municipal Enforcement | | T 70 | False Arrest |
| | H 90 | Housing - All Other | | T 71 | Fire Damage |
| | | | | T 90 | All other |
| Miscellaneous | M 00 | Injunction | Vehicular Torts | V 01 | Motor Vehicles* - Driver and/or Passenger(s) vs. Driver(s) |
| | M 10 | Receivership | | V 04 | Motor Vehicles* - Pedestrian vs. Driver |
| | M 15 | Receivership for Abandoned/Blighted Property | | V 05 | Motor Vehicles* - Property Damage only |
| | M 20 | Mandamus | | V 06 | Motor Vehicle* - Products Liability Including Warranty |
| | M 30 | Habeas Corpus (extradition, release from Penal Institution) | | V 09 | Motor Vehicle* - All other |
| | M 40 | Arbitration | | V 10 | Boats |
| | M 50 | Declaratory Judgment | | V 20 | Airplanes |
| | M 63 | Bar Discipline | | V 30 | Railroads |
| | M 66 | Department of Labor Unemployment Compensation Enforcement | | V 40 | Snowmobiles |
| | M 68 | Bar Discipline - Inactive Status | | V 90 | All other |
| | M 70 | Municipal Ordinance and Regulation Enforcement | | | *Motor Vehicles include cars, trucks, motorcycles, and motor scooters. |
| | M 80 | Foreign Civil Judgments - C.G.S. 52-604 & C.G.S. 50a-30 | | | |
| | M 83 | Small Claims Transfer to Regular Docket | Wills, Estates and Trusts | W 10 | Construction of Wills and Trusts |
| | M 84 | Foreign Protective Order | | W 90 | All other |
| | M 89 | CHRO Action in the Public Interest - P.A. 19-93 | | | |
| | M 90 | All other | | | |

**RETURN DATE: May 10, 2022**

**BBSR, LLC,**

**v.**

**ANHEUSER-BUSCH, LLC**

**SUPERIOR COURT**

**J.D. OF STAMFORD-NORWALK AT STAMFORD**

**COMPLAINT**

**MARCH 8, 2022**

## INTRODUCTION

1.      This action arises out of Defendant Anheuser-Busch, LLC's failure to meet its contractual obligations (express and implied) to compensate Plaintiff BBSR LLC. After Anheuser-Busch acquired the original hard seltzer brand, "SpikedSeltzer," from the Connecticut-based company that developed it, Boathouse Beverage LLC, Anheuser-Busch cannibalized SpikedSeltzer sales by launching its own competitive hard seltzer brands, including a new brand of its own invention called "Bon & Viv." BBSR, the contractual representative of the sellers of Boathouse and SpikedSeltzer, brings this action to compel Anheuser-Busch to compensate Plaintiff for sales of competitive hard seltzer products as the parties' agreement requires.

2.      Boathouse's founding principals, Nicholas Shields and David Holmes, invented the beverage category now known around the world as "hard seltzer." In 2013, they brought their ground-breaking "SpikedSeltzer" brand to market. Over the next three years, the brand experienced exponential market growth, attracting the attention of several leading alcoholic beverage companies with an interest in strategic acquisitions. In 2016, Shields and Holmes (together with the other equity holders of Boathouse, the "Sellers") sold Boathouse and its "SpikedSeltzer" brand to Anheuser-Busch. Since the "hard seltzer" category was new and growing by millions of cases per year at the time, the parties agreed to an "earnout" provision in the purchase agreement that would compensate the Sellers if, during a multi-year period after the

acquisition, Anheuser-Busch cannibalized Boathouse's SpikedSeltzer product by introducing competitive alcoholic seltzer products.

3.      Anheuser-Busch in fact *did* introduce multiple competing lines of hard seltzer, starting with Bon & Viv, for which it initially registered a trademark in its own name. Several more competitive seltzer products quickly followed, including Natural Light Seltzer, Bud Light Seltzer, Michelob Ultra Seltzer, Social Club Seltzer, and Cacti Agave Spiked Seltzer. Anheuser-Busch's agreement with Boathouse did not forbid it from creating and selling new, competing alcoholic seltzers. But, to incentivize Anheuser-Busch's continued focus on SpikedSeltzer, the parties agreed that if Anheuser-Busch sold competitive hard seltzer products that prevented SpikedSeltzer from reaching its full potential, the Sellers were eligible to receive an earnout payment that included a component based on sales of Anheuser-Busch's portfolio of competing products. That is precisely what happened here. Although the earnout was *specifically* negotiated to compensate the Sellers for Anheuser-Busch's introduction of competitive hard seltzer brands, Anheuser-Busch has failed to compensate the Sellers as agreed under the contract.

4.      Instead, Anheuser-Busch has turned the earnout payment terms on their head. Anheuser-Busch has claimed that Bon & Viv—which, in Anheuser-Busch's words, has a "new name," is a "new liquid," and comes with "new packaging"—qualifies as one of *Boathouse's* "products or brands" rather than a "Competitive Product" under the contract. This is wrong as a matter of contractual interpretation, as Anheuser-Busch's own actions make evident: Anheuser-Busch originally registered the Bon & Viv trademark in its own name, and only later transferred that registration to Boathouse. Based on Anheuser-Busch's flawed and disingenuous position, Anheuser-Busch has withheld tens of millions of dollars owed to the Sellers under the parties' carefully negotiated agreement.

2

5.      Anheuser-Busch's failure to pay the Sellers the earnout they are owed based on sales of hard seltzer products competitive with SpikedSeltzer—and its behind-the-scenes efforts to manufacture the appearance that it had no such obligation—entitles BBSR to the tens of millions of dollars in relief it seeks in this action.

## STATEMENT OF THE CASE

6.      Nicholas Shields, a fifth-generation brewer, conceived of the idea for an alcoholic seltzer in 2012. Inspired by a group of revelers enjoying a round of vodka sodas, he had the idea to use the beer-brewing method to create a drink that would be as light, clear, and refreshing as a vodka soda, but with beer's lower alcohol content and favorable tax treatment—making it friendlier to the waistline and the wallet. Shields experimented in the garage of his home in Westport, Connecticut, until he perfected a novel recipe that used sugar in place of malted barley and introduced champagne yeast instead of ale yeast to brew a clear, alcoholic, carbonated liquid. The result was SpikedSeltzer.

7.      Shields had a background in marketing and knew that success for this invention would be enhanced by a brand name that doubled as a description of the product. Mindful that brands like "vitaminwater" and "PretzelCrisps" were successful brands that combined two common words into a distinctive and catchy single-word, trademarked brand name, he settled on the name "SpikedSeltzer." Inspired by a sculpture of a mermaid in his Connecticut hometown, Shields selected a mermaid for the packaging.

8.      Shields then partnered with his old friend David Holmes to build SpikedSeltzer into a successful business. Holmes, who had spent his career in finance, used his expertise to raise funds for the business and build out its operations. The two partners formed Boathouse Beverage LLC to house the new business.

3

9.      Holmes asked an artist he knew to design a SpikedSeltzer logo featuring a single mermaid carrying a trident, resulting in the following:



10.     SpikedSeltzer grew rapidly, first in Connecticut and then throughout the Northeast. Competitors took notice. In 2015, Shields and Holmes learned that several established beverage industry players were working to mimic their hard seltzer product. Competitors plainly recognized the value of the SpikedSeltzer brand. Indeed, Boathouse received overtures from potential acquirers accompanied by the threat—sometimes implied, sometimes explicit—that if their advances were spurned, they had copycat products waiting in the wings.

11.     Shields and Holmes recognized that for their brand to compete against copycat competitors, they would need the production capacity, logistical support, and distribution network that the larger industry players could offer. They ultimately reached agreement on a sale to one of the largest brewers in the world, Anheuser-Busch (the "Agreement," attached hereto as Exhibit A). Under the Agreement, Anheuser-Busch acquired all of the equity of Boathouse together with all of the components of the SpikedSeltzer brand that Shields and Holmes had

4

built, including trademark rights to the name "SpikedSeltzer" and the SpikedSeltzer mermaid logo, as well as employment contracts with the two co-founders.

12.     Shields and Holmes believed in the value of the SpikedSeltzer brand, which had already amassed a significant, loyal following, and were confident that if Anheuser-Busch gave the brand the full support it promised, it would achieve tremendous growth. They understood that Anheuser-Busch had the experience and resources to provide SpikedSeltzer with the support and protection the brand would need to grow to its full potential. They also understood that joining an industry behemoth carried with it the risk that their new corporate owner might decide to launch its own competing hard seltzer product under a different brand name—whether an existing brand, like Michelob or Bud, or a new one—and put its weight behind that brand instead of SpikedSeltzer.

13.     Shields and Holmes foresaw this risk, and in response, negotiated for a protective provision that incentivized Anheuser-Busch *not* to cannibalize SpikedSeltzer with a "Competitive Product." As a deterrent to such cannibalization, Boathouse would be eligible for compensation based on the sales of such Competitive Products (in addition to sales of SpikedSeltzer).

14.     The Agreement, referring to Boathouse as "the Company," broadly defines "Competitive Product" as "any flavored alcohol seltzer product that is competitive with the Company's flavored alcohol seltzer beverage product within the United States (except as authorized in writing by Seller Representative)." When the Agreement was executed, Boathouse's sole "flavored alcohol seltzer beverage product" was SpikedSeltzer, a 6% alcoholic beer that came in four fruit flavors. Any "flavored alcohol seltzer" that was "competitive with" SpikedSeltzer was therefore presumptively a Competitive Product, not a Boathouse product or

5

brand (unless it was authorized as one in writing by BBSR, which did not occur here). If
Anheuser-Busch decided to use its considerable market leverage to market hard seltzer products
other than SpikedSeltzer, Boathouse's Sellers were eligible to receive a share of all "Competitive
Product" sales. In that scenario, the Sellers' earnout was dependent on the volume of sales of the
"Company's products or brand" *and* any "Competitive Product Volume" sold.

15.     Unfortunately, after executing the LOI that ultimately resulted in the Agreement,
Anheuser-Busch was slow to close on the acquisition. It was encumbered by a Department of
Justice antitrust case and distracted by the efforts of its parent company, AB-InBev, to complete
an acquisition of SABMiller. Meanwhile, Mark Anthony Brands and Boston Beer Company had
already launched their copycat hard seltzer brands, White Claw and Truly. With the resources of
large industry players behind them, White Claw and Truly quickly achieved dominant positions
nationwide in the exploding hard seltzer market. The idea that Nick Shields had first brought to
fruition in his garage in Connecticut had now given birth to the hottest new category in the
alcoholic beverage industry.

16.     In August 2016, Anheuser-Busch finally closed on its acquisition of Boathouse.
Shields and Holmes immediately worked to build the SpikedSeltzer brand within Anheuser-
Busch's corporate umbrella: They promptly set to work regaining the market share SpikedSeltzer
had lost to White Claw and Truly during the summer of 2016, an effort that was rewarded with
steady revenue growth.

17.     In 2017, however, Shields learned that Anheuser-Busch's Management
Committee, known within Anheuser-Busch as "MANCOM," had concerns about the brand's
viability. MANCOM had reached the conclusion that because "spiked" and "seltzer" might be
considered descriptive words, the name "SpikedSeltzer" might not be protected under trademark

6

law. Anheuser-Busch had evidently had a change of heart about the value of the brand it had

bought and was now unwilling to back it with the efforts that brands like "vitaminwater" and

"Xerox" undertake to protect their valuable trademarks against "genericization"—*i.e.*, the public

coming to view them as generic words or phrases rather than associating them with one brand.

Shields voiced his strong objections to Anheuser-Busch's plan to abandon SpikedSeltzer as a

brand name and replace it with a newly branded product, but was overruled and left powerless

against the MANCOM directive. Unfortunately, Anheuser-Busch had thrown in the towel on the

original hard seltzer brand, and with it that brand's chance to become the "Xerox" of hard

seltzer.

18.     In 2018, Anheuser-Busch announced a plan to launch a new brand of hard seltzer,

"Bon & Viv," touting its "new name, packaging, and liquid." Anheuser-Busch filed a registration

*on its own behalf* for a new trademark for the brand name "Bon & Viv" on September 14, 2018.

In presentations and correspondence to distributors, Anheuser-Busch made clear that "Bon &

Viv" was a new flavored alcoholic seltzer that it was rolling out to replace "SpikedSeltzer":



19.     Anheuser-Busch also publicized to its wholesalers and sales and marketing

personnel that Bon & Viv was a brand name that was "ownable & strategic," as compared to

SpikedSeltzer, which Anheuser-Busch now viewed as "segment generic." Anheuser-Busch's

7

abandonment of SpikedSeltzer's name, logo, brand story, taste, alcohol by volume ("ABV"), and packaging made it plain to distributors prior to Bon & Viv's launch that this new product was replacing SpikedSeltzer.

20.     Anheuser-Busch tried to lure SpikedSeltzer's existing customers to its own new brand by gracing the cans with two mermaids rather than one, retaining the words "Spiked" and "Seltzer" but with a space between them, and placing the name "Boathouse Beverage" rather than "Anheuser-Busch" in small letters at the bottom of the can. The plain truth, however, was that Anheuser-Busch was pulling SpikedSeltzer from the shelves.

21.     SpikedSeltzer's loyal customers were not fooled. They recognized that their beloved brand had disappeared. Complaints poured in from dissatisfied consumers expressing "absolute exasperation and disappointment" that Anheuser-Busch had taken "BY FAR the best 'hard' seltzer on the market and pretty much ruined it."

22.     Eventually, in response to demands from its wholesale network to bring SpikedSeltzer back, Anheuser-Busch experimented with re-releasing SpikedSeltzer as a competitive alternative to Bon & Viv.

23.     On August 12, 2019, Anheuser-Busch applied one of its flagship brand names to a hard seltzer product with its launch of Natural Light Seltzer, which it created to have the same 6% alcohol as the *original* SpikedSeltzer. Bud Light Seltzer soon followed. Sales of these brands quickly outstripped Bon & Viv's sales, which fell to nearly zero in 2021. By this time, Anheuser-Busch had reduced the remnants of the mermaid imagery and the words "spiked" and "seltzer" on the Bon & Viv packaging to comically small proportions. There could be no room for doubt that Anheuser-Busch had replaced SpikedSeltzer with its own corporate brand:

8



24.     Anheuser-Busch's marketing of Bon & Viv, Natural Light Seltzer, and Bud Light Seltzer at the expense of SpikedSeltzer was precisely the risk that Shields and Holmes had foreseen and mitigated against when they negotiated the critical earnout provision that permitted the Sellers to be compensated with a portion of sales from Competitive Products.

25.     Yet, when it came time for Anheuser-Busch to pay the Sellers the earnout they were owed, Anheuser-Busch—in an attempt to minimize the payment—demurred. It represented to the Sellers that Bon & Viv, one of the *least* successful of the new brands of hard seltzer it had launched, should be considered a Boathouse "product or brand" and *not* a Competitive Product.

26.     Anheuser-Busch took this position notwithstanding that it had touted Bon & Viv as a "new liquid" with "new packaging" under a "new brand"; notwithstanding that Anheuser-Busch had originally registered and owned the trademark for its own "new brand"; notwithstanding that Anheuser-Busch continued to sell more SpikedSeltzer than Bon & Viv in the Canadian market even after introducing Bon & Viv as a competitive alternative; and notwithstanding that Anheuser-Busch had re-introduced SpikedSeltzer in the U.S. market as a competitive alternative to Bon & Viv in response to customer demand. As a product competitive

9

with SpikedSeltzer (which BBSR never authorized as a Boathouse product), Bon & Viv is a "Competitive Product" under the Agreement.

27.     Behind the scenes, Anheuser Busch had been preparing to advance its self-serving position. Originally, in September 2018, Anheuser-Busch had registered the trademark for the name Bon & Viv (known as a "word mark" as it refers to only the text of the branding) for itself. This was a significant choice because Anheuser-Busch's standard practice was to register marks to be used by craft brands in its portfolio in the names of those craft brands. After the product's launch in January 2019, Anheuser-Busch applied for a second (stylized) Bon & Viv trademark and a new "double mermaid" trademark in March 2019—this time in the name of Boathouse. Then, on August 1, 2019, Anheuser-Busch transferred the original "Bon & Viv" word mark from Anheuser-Busch to Boathouse. This attempted cover-up of Anheuser-Busch's original ownership of the Bon & Viv word mark exposes the fatal flaw of Anheuser-Busch's position. The Agreement did not contemplate that Anheuser-Busch could manipulate the earnout payment to the Sellers by re-assigning trademarks at its whim.

28.     Sales figures for Bon & Viv relative to SpikedSeltzer gave Anheuser-Busch a motive for its maneuvering. Under the Agreement, if the sales of Boathouse's products or brands (in this case, SpikedSeltzer) exceeded 250,000 barrels in any one calendar year, the earnout payment would not be calculated based on sales of Competitive Products. Thus, the earnout could vary dramatically based on whether a product pushed Company product Volume over 250,000 barrels, or instead was a "Competitive Product." In determining the earnout due to Plaintiff, Anheuser-Busch wrongly claimed that this exception applied in order to avoid paying Plaintiff for sales of Competitive Products that were marketed to SpikedSeltzer's detriment. But of the 340,777 barrels of purportedly "Company" product sold in 2019, only *six* were

10

SpikedSeltzer—the remaining 340,771 barrels were Bon & Viv. Never did sales of SpikedSeltzer exceed 250,000 barrels in a calendar year. Against this backdrop, Anheuser-Busch was playing "hot potato" with the Bon & Viv trademark to artificially deflate the earnout payment paid to Plaintiff.

29.     Shields and Holmes will never get to see what would have happened if Anheuser-Busch had supported Boathouse and SpikedSeltzer, instead of phasing the brand out altogether. Under the terms of the Agreement, as a consequence of Anheuser-Busch's decision to abandon SpikedSeltzer and instead promote its own brands, the Sellers are entitled to payment of an earnout that includes compensation for Anheuser-Busch's competitor brands' sales. BBSR brings this action seeking a declaration that Bon & Viv is a Competitive Product vis-à-vis SpikedSeltzer; payment to the Sellers of the earnout amount that is commensurate with the proper categorization of Bon & Viv as a Competitive Product; and an award of punitive damages and attorneys' fees based on Anheuser-Busch's unfair business conduct.

## PARTIES AND RELEVANT NON-PARTIES

30.     Plaintiff BBSR LLC is a limited liability company organized under Connecticut law with its primary place of business located at 100 Imperial Avenue in Westport, Connecticut. Under the Agreement, Boathouse's various equity owners assigned to BBSR LLC the authority to represent and bind all Sellers in matters relating to the Agreement, including with regard to the earnout provision.

31.     Defendant Anheuser-Busch LLC is a limited liability company organized under Delaware law with its primary place of business located at 1 Busch Place in St. Louis, Missouri.

11

## JURISDICTION & VENUE

32.     This action is properly brought before this Court pursuant to Section 12.4 of the

Agreement, pursuant to which the parties consent to venue in "any federal or state court in which

jurisdiction for the defending party can be established."

33.     All of the parties to the litigation conduct regular business in the State. Anheuser-

Busch does constant business in Connecticut, including selling products for distribution in

Connecticut and advertising on Connecticut television. BBSR LLC is a Connecticut business

located in Westport, Connecticut. Boathouse Beverage LLC, the subject of the instant dispute, is

likewise a Connecticut business that originally created hard seltzer in Norwalk, Connecticut. The

dispute arises from Anheuser-Busch's acquisition of a Connecticut-domiciled company and its

subsequent failure to comply with the agreed terms of the acquisition.

## STATEMENT OF FACTS

### The Origin of SpikedSeltzer

34.     Nick Shields grew up in a family with a brewing tradition that dates back to 1870,

when German-born brewmaster Rudolph F. Haffenreffer founded his brewery in Jamaica Plain,

Boston. The original Haffenreffer Brewery, refurbished in 1983, is now home to a small micro-

brewery owned and operated by Samuel Adams.

35.     Following in his family tradition, Shields pursued a career in the beverage

industry that included product development and marketing positions at Nantucket Nectars,

Cadbury Schweppes, PepsiCo, and Dunkin' Brands before he joined the family business. As he

worked to revive Haffenreffer's storied brands, Shields saw an opportunity to innovate.

36.     Prior to the introduction of flavored alcoholic seltzers, the most popular flavored

alternatives to beer were so-called "flavored malt beverages," which are produced using a grain

12

malt fermented with a lager yeast. The flavored malt beverage category includes drinks like

Smirnoff Ice, Seagrams Escapes, and Mike's Hard Lemonade.

37.     Shields recognized a demand for a lighter beverage that would be similar to a

vodka soda (a highball cocktail made with vodka, soda water, and a splash of lime juice) but

could be marketed to a broader consumer base. In 2012, operating out of his garage in Westport,

Connecticut, Shields developed the formula for a flavored alcoholic seltzer product that would

change the landscape of the alcoholic beverage industry.

38.     Shields substituted sugar for the traditional grain base typically used in flavored

malt beverages and used a champagne yeast fermentation process to create a lighter, lower

calorie, and naturally gluten-free alcoholic beverage. Because sugar qualifies as a substitute for

malt under the governing provision of the Internal Revenue Code, the hard seltzer product

Shields invented qualified as an "IRC Beer" and was eligible for the favorable tax treatment

applicable to beer, rather than spirits. Shields diluted the product slightly with water to yield the

precise alcohol content of 6% that he wanted to achieve.

39.     In the summer of 2012, Shields enlisted his long-time friend Holmes to join his

beverage venture. The two partners founded Boathouse Beverage LLC. Holmes had left a career

in finance to partner with his friend; he contributed his financial expertise to raising funds for the

new business and building out its operations.

40.     With his background in marketing, Shields knew that his invention needed a

brand. He was aware that brands like "vitaminwater" and "PretzelCrisps" had succeeded with a

strategy of combining two common words into a single-word trademarked brand name.

Following this model, he settled on the name "SpikedSeltzer." Inspired by a statue near the

seaside in Westport, Shields decided to use a mermaid image for the SpikedSeltzer logo.

13

41.     Holmes asked an artist he knew to design a SpikedSeltzer logo featuring a single mermaid carrying a trident. Boathouse engaged an attorney to register the "SpikedSeltzer" word mark on the U.S. Patent and Trademark Office's Supplemental Register and also to register a logo featuring a single mermaid carrying a trident. No oppositions were filed challenging SpikedSeltzer's trademark registration applications. Boathouse did not seek trademark protection for the term "Boathouse Beverage," as it was merely the business entity that housed the SpikedSeltzer brand.

42.     Boathouse offered four unique flavors of SpikedSeltzer: (1) "Cape Cod Cranberry," (2) "Indian River Grapefruit," (3) "West Indies Lime," and (4) "Valencia Orange."

43.     By the end of 2013, Boathouse had become a regional powerhouse, with a growing customer base in Massachusetts, Connecticut, and New York. During the summer of 2014, the demand for SpikedSeltzer skyrocketed. After struggling to keep enough SpikedSeltzer in stock, Boathouse contracted with a brewery in Memphis, Tennessee, to assist with production and distribution.

44.     In 2015, Boathouse sold approximately 225,000 cases of SpikedSeltzer and increased distribution to 12 states throughout the Northeast and Mid-Atlantic region. By 2016, SpikedSeltzer was selling at a rate of more than 500,000 cases per year.

**Boathouse Negotiates a Sale**

45.     As word of SpikedSeltzer's success spread, Shields and Holmes learned from industry contacts that larger alcoholic beverage companies were working to develop their own hard seltzer products. Shields and Holmes knew that SpikedSeltzer needed to harness the resources of a larger alcoholic beverage company with nationwide distribution for the brand to reach its full potential. With the help of an investment banker with significant industry

14

experience, they engaged in discussions with potential acquirers including Diageo, Mark Anthony Brands, North American Breweries, MillerCoors, and Anheuser-Busch.

46.     The signs were clear that competition from copycat brands was imminent. Representatives of Mark Anthony Brands, for example, showed Shields and Holmes a hard seltzer they had created to imitate SpikedSeltzer, adding that if they didn't agree to a sale, Mark Anthony Brands would launch its own competing brand, and things "wouldn't go well" for Boathouse. Shields and Holmes also learned that Boston Beer Company was working on a hard seltzer product and that Anheuser-Busch was developing a hard seltzer product to be marketed under the name "Two Cents." (Later, at a visit to Anheuser-Busch's facilities on the day the acquisition closed, Holmes witnessed product developers pouring out a clear, carbonated beverage. When he inquired, he learned that Anheuser-Busch had been proceeding with the development of Two Cents just in case the acquisition did not go through.)

47.     Boathouse ultimately reached agreement with Anheuser-Busch, which made the most attractive offer. Anheuser-Busch had launched efforts to purchase multiple craft beer brands to try to keep up with the most current beverage industry trends. It recognized that SpikedSeltzer was a brand with proven success on a regional level, a uniquely marketable trademark, and a fresh and innovative product that Anheuser-Busch could release nationwide. For its part, Boathouse would be able to leverage Anheuser-Busch's corporate infrastructure, distribution network, and IP protection to continue to scale its growing brand.

**The Letter of Intent**

48.     On April 28, 2016, the parties executed a non-binding Letter of Intent ("LOI"), based on a draft Anheuser-Busch had prepared. The LOI provided that Anheuser-Busch would

15

acquire Boathouse for an upfront purchase payment of $11 million and an additional earnout payment due to Shields, Holmes, and the other equity holders at the end of 2021.

49.     Under the LOI, Anheuser-Busch was prohibited from "selling a competing flavored alcohol seltzer product" prior to the third anniversary of the closing, subject to exceptions to be negotiated. Although the parties did not specify the consequence of a breach of this provision in the LOI, they understood that such a prohibition would require an enforcement mechanism in the final agreement. Shields and Holmes were confident that with the right support, SpikedSeltzer would be a phenomenal success. But they knew that solidifying a position as a leading national brand would take time. They expected that a three-year runway would provide SpikedSeltzer with the time it needed to leverage Anheuser-Busch's corporate infrastructure and establish itself as a successful and proven nationwide brand, which Anheuser-Busch would not be tempted to abandon.

50.     The LOI further provided for different earnouts if Anheuser-Busch sold a "competing flavored alcohol seltzer product in the United States during the period between the third anniversary of the closing and December 31, 2021." If Anheuser-Busch did not sell any such competitive product, then the Sellers, through BBSR, would receive an earnout of the greater of: (1) $120 x the total volume of barrels of Company brands sold during the 2021 calendar year; or (2) $25 x the aggregate volume of barrels sold during the 2019-2021 calendar years. If Anheuser-Busch did sell such a competitive product, then Anheuser-Busch had to pay the Sellers the greater of: (1) $120 x the *highest volume* of barrels of Company brands sold in *any* calendar year during 2017-2021; or (2) $25 x the aggregate volume of barrels sold during the 2019-2021 calendar years. Shields and Holmes negotiated this provision so that if SpikedSeltzer sales initially increased, but then dropped in response to Anheuser-Busch's introduction of

16

another (competitive) product, the Sellers would be reasonably compensated for the potential loss of volume due to internal competition; they would be paid based on sales in the best year up through 2021.

51.     The LOI provided that the Sellers were not, however, entitled to a modification of the earnout amount based on competitive products introduced by a "craft brand" within Anheuser-Busch's portfolio. In the alcoholic beverage industry, the term "craft" is generally used to refer to independently owned brands with a hands-on focus on the art of brewing or distilling. The marketing of craft brands frequently highlights their founders and their origin story. With the growing popularity of craft brands, they have become popular targets for acquisition by the industry giants. Following such acquisitions, it is typical that craft brands maintain their "independent" brand identities for marketing purposes, because it is the value of those brand identities that makes them attractive acquisition targets in the first place.[1]

52.     In line with this trend, Anheuser-Busch had acquired multiple regional "craft" breweries, which it placed under the umbrella of its "High End" business unit. The acquired breweries within High End generally operated independently with regard to innovation, branding, and production; High End served to organize and allocate marketing and operating budgets, as well as to allocate supplemental production capacity. By 2019, High End contained more than 35 "craft brands." As then AB-InBev CEO Carlos Brito put it: "We're the number one craft beer brewer in the world."

53.     Accordingly, the proviso for "craft brands" in the LOI contemplated that Boathouse assumed the risk of competition from "hard seltzer" products launched by the other

---

[1] Recent examples of "craft" alcoholic beverage brands acquired by industry giants are Goose Island Beer Co. (acquired by Anheuser-Busch in 2011); High West Distillery (acquired by Constellation Brands in 2016); and Casamigos (acquired by Diageo in 2017).

17

"craft brands" that had been (or might be) acquired by Anheuser Busch—which at the time of the

Agreement were those companies in the High End portfolio. SpikedSeltzer would, however, be

protected from competition by brands created or launched by Anheuser-Busch's corporate

innovation and marketing groups.

### The Equity Purchase Agreement

54.     In May 2016, the parties exchanged preliminary drafts of an Equity Purchase

Agreement.

55.     Concurrent with the parties' negotiations, Anheuser-Busch was operating under

the constraint of antitrust litigation with the Department of Justice arising from the pending

purchase of SABMiller by Anheuser-Busch's parent company, AB-InBev. The resulting

slowdown in business operations within Anheuser-Busch's internal divisions during 2016

prolonged the negotiations on a definitive agreement and caused SpikedSeltzer to miss out on

peak months for hard seltzer sales in the summer of 2016.

56.     On August 26, 2016, the parties finally executed the definitive Equity Purchase

Agreement, to which BBSR was made a party as a representative for Boathouse's Sellers.

57.     The earnout provision of the Agreement, contained in Section 2.10, had certain

key features in common with the earnout provision in the LOI, but it also represented a

significant re-negotiation of terms. Instead of a blanket prohibition on Anheuser-Busch

introducing a "Competitive Product" during the three years following the closing, the parties

created a specific deterrent: if Anheuser-Busch did introduce such a "Competitive Product "

(defined as "any flavored alcohol seltzer product that is competitive with the Company's

flavored alcohol seltzer beverage product within the United States (except as authorized by

[BBSR])"), then the Sellers were eligible to receive, on top of the earnout amounts based on the

18

"Volume" of sales of the "Company's products or brand," a supplemental earnout amount based on "Competitive Product Volume." (Agreement Section 2.10(a)(iii).) The Sellers could not stop Anheuser-Busch from cannibalizing SpikedSeltzer with a competing brand, but, if Anheuser-Busch did so, the Sellers were eligible for compensation in the form of proceeds from sales of that competing brand.

58.     The Agreement provides one way for Competitive Products to be introduced without triggering the higher earnout payments: with written authorization from BBSR. Giving this power to BBSR, which was not acquired in the transaction but rather was a separate entity controlled by Shields and Holmes, allowed Shields and Holmes to protect against the potential for Anheuser-Busch to misuse its control of Boathouse and undermine the earnout provisions.

59.     The availability of earnout amounts based on Competitive Product Sales was subject to three exceptions: *First*, as had been the case in the LOI, the Agreement provided that a product "marketed under a craft brand" owned by Anheuser-Busch would not constitute a Competitive Product. *Second*, "Test Marketing" of a Competitive Product would not count toward sales. *Third*, the Agreement provided that "[n]otwithstanding the foregoing, if the Volume [of "the Company's products or brands"] sold during any one calendar year equals or exceeds 250,000 Barrels, the Earnout Amount shall not be calculated pursuant to Section 2.10(a)(iii)" (where Section 2.10(a)(iii) was the provision that allowed for an earnout payment based on "Competitive Product Volume"). With this third exception, the parties recognized the possibility that SpikedSeltzer might enjoy significant success even alongside competition from a competitive product. If SpikedSeltzer's sales reached a certain critical mass that would give it the chance to compete nationally, then the Sellers would no longer receive the benefit of a hedge

19

against the possibility that Anheuser-Busch would promote a competing brand without giving

SpikedSeltzer a chance to succeed.

60.    This last exception meant that the earnout paid to BBSR could vary dramatically

depending on whether a product counted as one of the "Company's products or brands," and thus

pushed the "Company Volume" over 250,000, or instead was a "Competitive Product" (which

would trigger a more favorable earnout for BBSR).

61.    Underscoring that the intellectual property associated with the SpikedSeltzer

brand was central to the transaction, the Agreement incorporated multiple Schedules detailing

the various branded products, registered trademarks, internet domain names, and other

intellectual property that Anheuser-Busch was buying:

### SCHEDULE 3.22(a)

#### BRANDS

1. Cape Cod Cranberry
2. Indian River Grapefruit
3. West Indies Lime
4. Valencia Orange

**SCHEDULE 3.22(b)**

**REGISTERED INTELLECTUAL PROPERTY**

| Mark | Application Date | Serial Number | Registration Date | Registration Number |
|---|---|---|---|---|
|  | August 17, 2013 | 86040871 | November 11, 2014 | 4,635,337 |
| SPIKEDSELTZER | August 21, 2013 | 86043547 | August 26, 2014 | 4,594,628 |
| SPIKEDLIFE | August 27, 2015 | 86738732 | April 5, 2016 | 4,932,182 |

| Domain Names |
|---|
| spikedseltzer.com |
| spikedlife.com |

62.    The Agreement also provided that Boathouse would deliver to Anheuser-Busch employment agreements between Boathouse and its two key executives, Shields and Holmes, at closing. Anheuser-Busch thus ensured that the co-founders of the brand would continue to be associated with it during its integration into Anheuser-Busch. Indeed, in its September 2, 2016, press release announcing the acquisition, titled "Anheuser-Busch Adds SpikedSeltzer to the High End," Anheuser-Busch proclaimed that SpikedSeltzer would operate with "autonomy and support for growth" within the High End business unit.

63.    While the Agreement provides that Anheuser-Busch was acquiring the "Boathouse Beverage" name, there were no associated Boathouse trademarks. This was because Boathouse was solely the business entity—it had no consumer loyalty or brand awareness. What Anheuser-Busch was acquiring was the SpikedSeltzer brand. Indeed, this fact was apparent from the first sentence of the Agreement, which lists "Boathouse Beverage LLC *dba SpikedSeltzer*," reflecting that, while Boathouse was the legal entity being acquired, SpikedSeltzer was the name

21

by which the business was known. Anheuser-Busch's contemporaneous press release likewise underscored that the economic value Anheuser-Busch was buying was in the SpikedSeltzer brand—defined twice as a 6% alcohol product—rather than in Boathouse, which was mentioned only in passing. The press release also proudly touted the facts that "[w]ith SpikedSeltzer, founders Nick Shields and David Holmes created an alcohol category that did not exist prior to its arrival on the market" and that "SpikedSeltzer has grown from five gallon batches to more than 500,000 case equivalents and is now distributed in 14 states."

### The Post-Closing Transition

64.    Anheuser-Busch's acquisition of Boathouse closed on August 29, 2016. After the transaction closed, Boathouse began to transition its operations to Anheuser-Busch.

65.    Management oversight over Boathouse was assigned to Felipe Szpigel, the President of Anheuser-Busch's "High End" business unit, which housed its craft beer, flavored malt, and other specialty beverage products. Carrie Shafir, also at Anheuser-Busch, was assigned as Boathouse's primary contact and marketing director. Boathouse's brewing and production operations were soon transferred to Anheuser-Busch facilities in Baldwinsville, New York, and all sales were coordinated through Anheuser-Busch's central ordering system, BudNet.

66.    Aware of the limited window SpikedSeltzer had to leverage its position as one of the first hard seltzer products to enter the market, Shields and Holmes were anxious to get Boathouse's new operations up and running. But rather than coordinate a strategy for the national distribution of SpikedSeltzer in the early stages of the transition, Anheuser-Busch delayed the nationwide release of the product until eight months after closing.

**Copycat Brands Take Advantage of Anheuser-Busch's Delay to Seize Market Share**

67.     Anheuser-Busch's significant delay would prove disastrous for SpikedSeltzer's positioning as a market leader. At the time of the LOI, Boathouse's SpikedSeltzer was widely recognized as "the original Hard Seltzer." Anheuser-Busch subsequently squandered SpikedSeltzer's prime position.

68.     In 2016, while SpikedSeltzer had been sitting on Anheuser-Busch's backburner, Mark Anthony Brands and Boston Beer Company had released their own hard seltzer products, White Claw and Truly, respectively, for national distribution. The immediate introduction of competitive products like White Claw and Truly to a national consumer base positioned them as front runners in the beverage category that SpikedSeltzer had created.

69.     By contrast, Anheuser-Busch did not launch SpikedSeltzer for national distribution until mid-2017. In October 2021, when asked to comment on the decline of SpikedSeltzer after the Anheuser-Busch acquisition, Brendan Whitworth, now CEO of the company, admitted that Anheuser-Busch lacked the "R&D capabilities" and "structure to focus on it" at the time of acquisition.

70.     Despite Anheuser-Busch's neglect, Boathouse managed to keep the SpikedSeltzer brand on a course of sustained growth. By the end of 2017, Boathouse sold approximately 140,000 barrels of SpikedSeltzer nationwide, which equates to approximately 1.9 million cases, or nearly four times the 500,000-case volume that Anheuser-Busch had heralded in its own press release announcing the acquisition.[2] That same year, however, the leading competitor, White Claw, reportedly experienced 449% growth in sales in its first full year of operation. (White

---

[2] Barrels and cases are customary units for measuring volume in the beverage industry. A case contains 24 12-ounce cans or bottles of liquid, and a barrel is equivalent to 13.78 cases.

23

Claw was the copycat brand that Mark Anthony Brands had launched after warning Shields and Holmes that if they rejected its offer to purchase Boathouse, things wouldn't go well for them.)

71.     In the fall of 2017, Shields was informed that Anheuser-Busch's Management Committee, MANCOM, had directed Boathouse to create a parent brand for SpikedSeltzer due to purported concerns related to the SpikedSeltzer word mark and logo. Anheuser-Busch had apparently reached the conclusion that because "spiked" and "seltzer" were common words, a central piece of the intellectual property that Anheuser-Busch spent millions of dollars to obtain from Boathouse—the brand name "SpikedSeltzer"—may have been somehow ineligible for protection under trademark law. Shields was not informed of any specific challenges that competitors had made to the trademarks, which Boathouse had properly registered with the assistance of counsel in 2013.

72.     Shields disagreed with the MANCOM directive, but he had his marching orders. Shields took the directive back to the Boathouse internal marketing team and began drafting a new parent brand marketing strategy. Shields and the Boathouse team proposed "Water Street" as a parent brand name that could complement rather than replace the established SpikedSeltzer brand. Boathouse's original location in Norwalk, Connecticut, was the inspiration for "Water Street." Shields projected a future evolution of a line of new "Water Street" products, such as "SpikedTonics," that would be marketed under the Water Street brand umbrella. Without explanation, Anheuser-Busch rejected "Water Street" as a parent-brand concept.

### SpikedSeltzer Is Moved to the "Beyond Beer" Division and Then Abandoned

73.     In the summer of 2018, continued internal reshuffling left Boathouse without clear strategic direction within Anheuser-Busch. Szpigel stepped down as VP of the High End Division. Anheuser-Busch then transferred Boathouse to a new business unit called Beyond

24

Beer, home to Anheuser-Busch's portfolio of flavored alcoholic and non-alcoholic beverages sold within the United States. Chelsea Phillips, who had previously managed Anheuser-Busch's budget-friendly beer brands, received a promotion to VP Marketing of Beyond Beer Group, and with it, responsibility for SpikedSeltzer.

74.    Boathouse's transition to Beyond Beer, under Phillips' direction, marked the end of the Company as it had formerly existed. Most Boathouse employees were terminated. Shields was permitted to stay on in a much-diminished role that included consulting on flavor development and appearing in advertisements. Beyond Beer fired the marketing company hired by Boathouse and replaced it with its own internal marketing team and strategic marketing agency, Bullish.

75.    In July 2018, Anheuser-Busch launched "Project Siren," a product development project for the invention of a "new liquid," whose "competitive benchmark [was the] Original SpikedSeltzer base." The new product was slated to be finalized in August after consumer feedback surveys were complete. This "new liquid" would soon become the base of Beyond Beer's new hard seltzer brand, "Bon & Viv."

76.    On August 17, 2018, Shields received an email from the new marketing team at Beyond Beer attaching a compilation of consumer feedback and noting that further instructions would follow detailing the "reno flavors & phase out plan for current product." This communication was the first time Shields had been informed about a plan to "phase out" SpikedSeltzer.

77.    That same day, Shields responded to Phillips and the Beyond Beer marketing team, expressing his strong opposition to the discontinuation of SpikedSeltzer and its

25

replacement with a lower-ABV product. Shields explained that "phasing out" SpikedSeltzer and offering a 1g carb product in its place would be a "TERRIBLE idea."

78.     Instead, Shields proposed a continuation of the majority of the existing SpikedSeltzer product line, in addition to a new lower calorie extension of SpikedSeltzer, called SPIKEDSELTZER90. He noted that the flavor profile of a 90-calorie variation would be markedly different from that of the original SpikedSeltzer product. Shields warned that wholesale discontinuation of SpikedSeltzer would result in confusion for wholesalers and dissatisfaction from the consumer base. Shields' objections were ignored.

### Anheuser-Busch Creates a New Brand to Replace SpikedSeltzer

79.     Unbeknownst to Shields, on September 14, 2018, Anheuser-Busch applied to register a trademark for a new word mark: Bon & Viv. The identity of the applicant is plain on the face of the application as recorded in the Patent and Trademark Office's register—Anheuser-Busch registered the Bon & Viv mark for itself:

| MARK INFORMATION | |
| --- | --- |
| *MARK | BON & VIV |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| LITERAL ELEMENT | BON & VIV |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size, or color. |
| REGISTER | Principal |
| APPLICANT INFORMATION | |
| *OWNER OF MARK | ANHEUSER-BUSCH, LLC |
| *STREET | ONE BUSCH PLACE |
| *CITY | ST. LOUIS |

80.     With this word mark in hand, Anheuser-Busch announced the 2019 launch of a new hard seltzer product called Bon & Viv Spiked Seltzer, which contained 0g of sugar and

4.5% alcohol content. The new Bon & Viv alcoholic seltzer offered five flavors, which were different from SpikedSeltzer's product line.

81.     SpikedSeltzer remained in production in the United States and Canada at the time of Bon & Viv's release. During 2018, it had seen a large increase in sales, held approximately 13% of total shares in the hard seltzer market, and remained a consumer favorite. Indeed, despite the fact that Anheuser-Busch provided greater resources to other brands and less funding to SpikedSeltzer, SpikedSeltzer had maintained steady growth, selling more than two hundred thousand barrels in 2018, which equates to more than three million cases. Anheuser-Busch's narrative that SpikedSeltzer was a failing brand that "needed to evolve" was patently inconsistent with data showing consistent growth in sales and customer satisfaction.

82.     Anheuser-Busch promoted Bon & Viv as a "revamp to Spiked Seltzer with a new name, packaging, and liquid." It was clear from Anheuser-Busch's description of Bon & Viv as "the first product under the new brand" that Anheuser-Busch intended to and did create an entirely new brand that would compete with the existing Boathouse product. Indeed, Anheuser-Busch hoped the new packaging would "begin[] efforts to establish a brand for people to reach for in an otherwise sterile segment."

83.     Bon & Viv was a replacement for the SpikedSeltzer brand that Anheuser-Busch had abandoned. This was precisely the situation the parties had foreseen when they drafted the broad definition of Competitive Product to encompass "*any* flavored alcohol seltzer product that is competitive with the Company's flavored alcohol seltzer beverage product."

84.     In November 2018, Phillips and the Beyond Beer team identified the launch of Bon & Viv as the business unit's "top priority." All wholesalers and retailers were directed to "manage down" SpikedSeltzer inventory and cease use of SpikedSeltzer promotional materials,

replacing it with the new Bon & Viv branding. Anheuser-Busch quickly eliminated SpikedSeltzer from the market, at least in the United States. In 2018, for example, Anheuser-Busch sold 56,654 barrels of the flagship "Indian River Grapefruit" flavor (equating to more than 780,000 cases) in the United States. In 2019, it sold zero cases in the United States. In Canada, however, Anheuser-Busch chose a different approach. Even after Anheuser-Busch released Bon & Viv to the Canadian market in 2019, it continued to sell SpikedSeltzer there, and in fact sold more SpikedSeltzer than Bon & Viv.

85.    In an attempt to lure SpikedSeltzer's existing customers to its new brand, Beyond Beer fashioned a logo for the new Bon & Viv brand that featured two mermaids holding a trident rather than one. The new Bon & Viv logo contained the words "SPIKED SELTZER" in an arched placement over the two mermaids, with a space added between the words to distinguish it from the SPIKEDSELTZER word mark.

86.    Abandoning the origin story of SpikedSeltzer, Beyond Beer created a fictional brand story featuring two mythical mermaids, "Bonnie" and "Vivian," the "founders" of the new Bon & Viv hard seltzer. The new product was released for national distribution in January 2019, just in time for a promotional slot during the 2019 Super Bowl in February.[3]

87.    Whatever Bon & Viv may have been, it was not a "craft brand"; it was a flavored alcohol seltzer product marketed under a corporate, *non-craft* brand "owned by Buyer"—and therefore a "Competitive Product" under the Agreement.

88.    By February 2019, operations related to Boathouse and SpikedSeltzer ceased. Anheuser-Busch erased SpikedSeltzer from Beyond Beer's strategic plan. Shields assumed an

---

[3] The Super Bowl ad was a spoof of "Shark Tank" and featured two actresses playing "Bonnie" and "Vivian." https://www.youtube.com/watch?v=rvmVFgj56jY.

even more limited and largely ceremonial role, in which he took direction from Anheuser-Busch, which emphasized he was merely a "former" owner.

89.     In March 2019, Anheuser-Busch caused Boathouse to apply for a stylized "Bon & Viv" trademark and a new "double mermaid" logo trademark, without notice to Shields, Holmes, or BBSR. On May 14, 2019, the U.S. Patent and Trademark Office granted Anheuser-Busch's original application to register the Bon & Viv word mark. Three months later, on August 1, 2019, Anheuser-Busch assigned that Bon & Viv trademark to Boathouse, without informing Shields, Holmes, or BBSR.

### Bon & Viv's Profitability Lags Behind Other Hard Seltzers

90.     As Shields predicted, Bon & Viv failed to meet customer expectations and significantly lagged in sales, notwithstanding the substantial resources expended on its promotion. Confusion arose among loyal consumers of SpikedSeltzer as it became apparent that Bon & Viv was an entirely different liquid.

91.     Unhappy customers complained that Anheuser-Busch "took BY FAR the best hard seltzer on the market (which was the old Spiked Seltzer recipe) and pretty much ruined it"; dubbed Bon & Viv "absolute trash" for which they had "HATE HATE HATE"; described the new flavors as "vomit-inducing"; bemoaned that the new "gross" and "watered down" taste had forced them to switch to other brands of hard seltzer, like Truly and White Claw; reproached SpikedSeltzer for "sell[ing] out to the big boys"; and pleaded for the return of SpikedSeltzer.

92.     Customers were so displeased with Bon & Viv's lower alcohol content—4.5% compared to SpikedSeltzer's 6%—that news outlets reported that the internet had "broken out torches and pitchforks—metaphorically, of course." Fans of the original SpikedSeltzer used the hashtag "#wearethesixpercent" to mock the new product: one SpikedSeltzer loyalist posted a

29

video to Instagram in which she poured out cans of Bon & Viv into her sink with the hashtags #wearethesixpercent, #downwith4.5percent, and #wherethisbelongs (*i.e.*, down the drain).

93.     Three weeks before the third anniversary of Anheuser-Busch's acquisition of Boathouse, on August 12, 2019, Anheuser-Busch launched Natural Light Seltzer, a product with the same 6% alcohol as the original SpikedSeltzer. This was just eleven days after the belated transfer of the original Bon & Viv word mark from Anheuser-Busch to Boathouse. By mis-categorizing Bon & Viv as a Company rather than Competitive product, Anheuser-Busch wrongly denied Plaintiff an earnout based on Natural Light Seltzer and Bud Light Seltzer sales, as the Agreement requires.

**The Earnout Dispute**

94.     In September 2019, Shields raised concerns with Matthew Gilbertson, a VP of M&A and Treasury at Anheuser-Busch, about the implications of Anheuser-Busch's replacement of SpikedSeltzer with Bon & Viv and its subsequent launch. Shields conveyed to Gilbertson the Sellers' position that Bon & Viv and Natural Light Seltzer were both "Competitive Products" under the Agreement and that the Sellers were entitled to a commensurate earnout. Shields pointed out that Anheuser-Busch planned to launch "Social Club Seltzer" in 2020; Shields, whose employment agreement was with Boathouse, had assisted with the formulation of the product, but the Beyond Beer team was responsible for its branding. Shields remarked that if Social Club was to be categorized as a "Competitive Product," Bon & Viv should be as well.

95.     In response, Gilbertson stated that he hadn't looked at the Agreement since it was signed. In a subsequent email exchange on the issue, Gilbertson relayed Anheuser-Busch's position that "Beyond Beer product innovation projects are just not appropriately part of our

30

Boathouse Beverage M&A transaction Agreement Earnout." This flatly contradicted the terms of the Agreement, which clearly state that any competitive flavored alcohol seltzer product—whether a Beyond Beer product innovation or not—was eligible to be part of the Agreement's earnout.

96.      Shields responded in a November 22 email, explaining that Bon & Viv was "a Beyond Beer concept" and "not a Boathouse product." As Shields pointed out, the Beyond Beer team led by Chelsea Phillips (VP Marketing of Beyond Beer Group), Randy Ornstein (VP Sales of Beyond Beer Group), and Jake Kirsch (VP Innovation of Beyond Beer Group) "brought Bon & Viv to life as a new brand, separate and different from SpikedSeltzer"; SpikedSeltzer had been replaced with "a radically changed formula and new brand"; and "US consumers viewed Bon & Viv as a separate and different brand from SpikedSeltzer."

97.      On December 18, 2019, Thomas Larson, an in-house lawyer at Anheuser-Busch, responded to Shields' November 22 email, outlining Anheuser-Busch's position with respect to Bon & Viv's purported qualification as a "Company Product." Anheuser-Busch did not reference any authorization from BBSR (because there was none), but instead placed the weight of its position on two slender reeds.

98.      *First*, Anheuser-Busch cited Boathouse's purported responsibility for "production and shipment" of Bon & Viv. This claim was false. Anheuser-Busch in fact produced Bon & Viv at its own brewing facilities and shipped it using its own distribution network, only slapping the "Boathouse" name on the label. This had been the plan from the beginning: Anheuser-Busch's own September 2, 2016, press release had noted that "[p]roduction will gradually shift from Boathouse Beverage's current production partners—North American Breweries and Blues City Brewery—to *Anheuser-Busch's* Baldwinsville Brewery." (Emphasis added.)

31

99.    *Second*, Anheuser-Busch cited Boathouse's ownership of the Bon & Viv trademark but withheld the telltale fact that Anheuser-Busch had originally applied for the trademark *for itself*. Only later did Anheuser-Busch transfer the original Bon & Viv trademark to Boathouse, in a scheme to manipulate the earnout.

100.    Both of the purported rationales Anheuser-Busch relied upon were highly misleading. Neither supported its position that Bon & Viv is a Boathouse product. And neither looked to the language of the Agreement itself.

101.    The motivations for Anheuser-Busch's dissembling are plain. It would have been clear to Anheuser-Busch by December 2019 that it was within months of launching Bud Light Seltzer. It also would have been clear that Bon & Viv's 2019 sales would exceed 250,000 barrels. When Anheuser-Busch finally responded in December to the question Shields had posed in September, the high stakes of its answer were evident.

102.    Anheuser-Busch could not deny that it had launched a Competitive Product within three years of the Boathouse acquisition, because it had launched Natural Light Seltzer within that time. Now Anheuser-Busch was set to apply its most popular brand, Bud Light, to a hard seltzer product. The only way Anheuser-Busch could attempt to withhold any portion of Bud Light Seltzer sales from the Boathouse Sellers was to take the position that Bon & Viv was somehow a Boathouse product, and not a Competitive Product.

103.    Shields' response to Larson explained the illogic of Anheuser-Busch's position. As Shields observed, the Beyond Beer team's "overreach" had "created an exodus of original SpikedSeltzer customers, to the tune of at least 100,000 barrels." And as Shields further explained: "These lost customers didn't see 'Boathouse' as the brand. They were buying

32

SpikedSeltzer—a formula, logo, and brand story that they liked, all of which were changed." Anheuser-Busch never responded.

104.    Consumers continued to demand the original SpikedSeltzer product. In 2020, due to consumer demand in Boathouse's original primary markets, Anheuser-Busch re-released SpikedSeltzer in limited quantity. For the second time, SpikedSeltzer and Bon & Viv were distributed alongside one another in the United States market, underscoring that they were competitive brands.

105.    In January 2020, Anheuser-Busch released a third flavored alcoholic seltzer to the market—Bud Light Seltzer. A few months later, Anheuser Busch added Social Club Seltzer to its lineup; then in 2021, it added Cacti Agave Spiked Seltzer.

## Anheuser-Busch Intentionally Miscategorizes Bon & Viv as a "Company" Rather Than a "Competitive" Product to Shortchange the Boathouse Sellers

106.    On January 31, 2022, Anheuser-Busch issued payment to BBSR, purporting to constitute the earnout amount due under the Agreement. The payment was accompanied by a calculation report, indicating Anheuser-Busch's inclusion of all Bon & Viv products sold between 2019 and 2021 in its calculation of "Volume" sold by Boathouse.

107.    According to Anheuser-Busch, the total Company Volume in 2019 was 340,777 barrels, putting BBSR above the 250,000-barrel cap set forth in Section 2.10(a)(iii), and thus ineligible for an earnout that was based on any Competitive Product Volume. But of the 340,777 barrels sold, *only six barrels* were SpikedSeltzer, and the remaining 340,771 barrels were Bon & Viv. If Anheuser-Busch had properly characterized Bon & Viv as the Competitive Product that it was, then BBSR would have been entitled to the more favorable earnout payment under Section 2.10(a)(iii).

33

108. On February 23, 2022, Anheuser-Busch issued a revised calculation report, which corrected the prior report's omission of Canadian sales. According to the revised report, Canadian sales in 2019 included 5,229 barrels of SpikedSeltzer products and 2,169 barrels of Bon & Viv products. With those sales included, Anheuser-Busch now calculated the total Company Volume for 2019 to be 348,175 barrels. It remained the case that if Anheuser-Busch had properly characterized Bon & Viv as the Competitive Product that it was, then BBSR would have been entitled to the more favorable earnout payment under Section 2.10(a)(iii).

109. Bon & Viv is a Competitive Product under the Agreement. "Competitive Product" is defined to include "*any* flavored alcohol seltzer product" that was "competitive with the Company's [*i.e.*, Boathouse's] flavored alcohol seltzer beverage product." (Emphasis added.) Boathouse's product is in the singular because the only Boathouse "flavored alcohol seltzer beverage product" at the time of contracting was SpikedSeltzer, and therefore any product that was "competitive with" SpikedSeltzer was not a Company product or brand, but rather a Competitive Product, unless it received BBSR's authorization (which did not happen here).

110. Bon & Viv was a new product, with new branding, a new recipe, and a new logo. It was developed by Anheuser-Busch over Shields' strong opposition and largely without his input. It never received authorization from BBSR. Anheuser-Busch sold SpikedSeltzer side-by-side with Bon & Viv, at least at some times and in some markets, but ultimately discontinued the brand over loyal customers' vehement objections and complaints.

111. Bon & Viv was much less successful than Bud Light Seltzer or Natural Light Seltzer. Anheuser-Busch saw an opportunity and capitalized on it by unilaterally and wrongfully categorizing the flagging Bon & Viv as a Boathouse product, even though Anheuser-Busch knew it was not. That scheme to misclassify Bon & Viv allowed Anheuser-Busch to shortchange

34

BBSR to the tune of tens of millions of dollars. Instead of receiving an earnout based on

Competitive Product Volume—including from the hugely profitable Natural Light and Bud

Light Seltzers into which Anheuser-Busch had funneled resources at SpikedSeltzer's expense—

Boathouse's Sellers received an artificially deflated earnout payment.

112.    In sum, Anheuser-Busch relied on its unilateral, wrongful, deceptive, and unfair

determination that Bon & Viv was a "Company" product to maintain that the favorable earnout

provisions in Section 2.10(a)(iii) of the Agreement would not apply. Using this flawed position

as cover, Anheuser-Busch withheld from the Sellers tens of millions of dollars in earnout

payment for the "Competitive Product Volume" attributable to Natural Light Seltzer and Bud

Light Seltzer and kept that money for itself, to the detriment of BBSR.

## CLAIMS FOR RELIEF

## COUNT ONE

## DECLARATORY JUDGMENT

113.    Plaintiff incorporates the allegations set forth in Paragraphs 1 through 112.

114.    On August 26, 2016, the parties executed the Agreement, which establishes their

respective rights and obligations.

115.    In Section 2.10(a)(ii) of the Agreement, the parties defined "Competitive

Product[s]" as "any flavored alcohol seltzer product that is competitive with the Company's

flavored alcohol seltzer beverage product" sold by Anheuser-Busch within the United States

(except as authorized in writing by Seller Representative).

116.    At the time the Agreement was executed, the Company's flavored alcohol seltzer

beverage product was branded as "SpikedSeltzer" and contained 6% alcohol.

35

117.    Anheuser-Busch subsequently replaced SpikedSeltzer with a different product, branded as "Bon & Viv," which contained 4.5% alcohol. At some times and in some markets, Anheuser-Busch offered both Bon & Viv and SpikedSeltzer as alternative options for its wholesalers. The Seller Representative, Plaintiff, never authorized Bon & Viv.

118.    Anheuser-Busch has taken the position that Bon & Viv is a "Company" product within the meaning of the Agreement. In reliance on this position, Anheuser-Busch has paid BBSR an earnout that is tens of millions of dollars less than the earnout Anheuser-Busch owes if Bon & Viv is a Competitive Product.

119.    Plaintiff's position, however, is that Bon & Viv is a "Competitive Product" under the Agreement. This is evidenced by, *inter alia*, the facts that Bon & Viv is not SpikedSeltzer; that Bon & Viv was marketed under the Bon & Viv brand name; that the Bon & Viv brand name is a corporate, non-craft brand; that Anheuser-Busch first registered the trademark for Bon & Viv in its own name; and that Anheuser-Busch at some times and in some markets offered SpikedSeltzer and Bon & Viv for sale simultaneously as alternatives to one another.

120.    An actual *bona fide* and substantial issue in dispute exists between the parties concerning the interpretation of the term "Competitive Product" under Section 2.10(a)(ii), the term "Company's products and brands" under Section 2.10(b), and Plaintiff's right to benefits under the Agreement, which are ripe for adjudication and resolution by way of declaratory judgment. Declaratory judgment is properly entered at this time; delayed determination of the dispute will result in harm if the issue is not resolved prior to any further action by the parties to determine the earnout amount owed to Plaintiff under Section 2.10 of the Agreement.

121.    Accordingly, Plaintiff seeks a declaratory judgment establishing that Bon & Viv is a "Competitive Product" under the Agreement.

122.    The issuance of a declaratory judgment by this Court is appropriate, will fully resolve issues of contractual interpretation related to the contested terms in the earnout provision, and will provide clarity to the parties, as well as any relevant third-party, with respect to the parties' rights and obligations under Section 2.10 of the Agreement.

## COUNT TWO

## BREACH OF CONTRACT

123.    Plaintiff incorporates the allegations set forth in Paragraphs 1 through 112.

124.    Plaintiff, Boathouse, and Anheuser-Busch executed and entered into a binding Agreement whereby Anheuser-Busch acquired all equity in Boathouse, together with Boathouse's intellectual property.

125.    Plaintiff and Boathouse have performed all of their obligations under the Agreement.

126.    Pursuant to the Agreement, Anheuser-Busch was obligated to pay Plaintiff an earnout payment based on a formula set forth in Section 2.10(a) of the Agreement, which had as potential inputs both the "Volume" of sales of "the Company's [*i.e.*, Boathouse's] products and brands" and the "Competitive Product Volume" of sales of "any flavored alcohol seltzer product that is competitive with the Company's flavored alcohol seltzer beverage product within the United States (except as authorized in writing by Seller Representative)."

127.    Section 2.10(a)(iii) provided that "[i]n the event Buyer sells any Competitive Product within the United States (except as authorized in writing by Seller Representative) during the period extending from and including the Closing Date through and until the third (3rd) anniversary of the Closing Date," Anheuser-Busch was to pay Plaintiff an earnout that included a multiple of "Competitive Product Volume."

37

128.    Section 2.10(a)(iii) further provided that "[n]otwithstanding the foregoing, if the

Volume sold during any one calendar year equals or exceeds 250,000 Barrels, the Earnout

Amount shall not be calculated pursuant to Section 2.10(a)(iii), but only in accordance with

Section 2.10(a)(i) or Section 2.10(a)(ii), as applicable." Both Section 2.10(a)(i) and Section

2.10(a)(ii) provide for an earnout based solely on a multiple of Company Product Volume, and

not on any multiple of Competitive Product Volume.

129.    Between approximately January 28, 2019, and August 29, 2019, prior to the third

anniversary of the Closing Date, Anheuser-Busch caused two competitive flavored alcoholic

seltzer beverage products to be sold in the United States, under the brand names Bon & Viv and

Natural Light Hard Seltzer. Plaintiff did not authorize either product. Sales of these two

Competitive Products triggered the applicability of Section 2.10(a)(iii).

130.    On January 31, 2022, Anheuser-Busch paid an earnout amount to Plaintiff.

Anheuser-Busch determined this earnout amount based on the assumption that Bon & Viv

Seltzer was a "Company" product or brand and not a Competitive Product. Because combined

sales of SpikedSeltzer and Bon & Viv had exceeded 250,000 barrels in 2019, before dropping

precipitously in 2020, Anheuser-Busch determined the earnout based on Section 2.10(a)(ii),

applying a multiple to SpikedSeltzer and Bon & Viv sales only, and categorizing both as

"Company" product sales.

131.    Anheuser-Busch's categorization of Bon & Viv as a "Company" product was

incorrect. Bon & Viv is in fact a "flavored alcohol seltzer product that is competitive with the

Company's flavored alcohol seltzer beverage product," SpikedSeltzer. Anheuser-Busch's

determination of the earnout based on its incorrect categorization of Bon & Viv as a "Company"

product rather than as a "Competitive Product" was a material breach of the Agreement.

38

132.   Plaintiff has been harmed by the breach and is entitled to monetary damages of tens of millions of dollars, including but not limited to, the difference in value between the earnout payment issued on January 31, 2022, and the correct amount as determined in accordance with Section 2.10(a)(iii) of the Agreement.

## COUNT THREE

## BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

133.   Plaintiff incorporates the allegations set forth in Paragraphs 1 through 112, and in the alternative to Count Two, alleges as follows:

134.   By way of execution of the Agreement, the parties agreed to the definition and meaning of the terms "Volume" and "Competitive Product Volume" provided in Section 2.10 of the Agreement.

135.   Prior to the third anniversary of the Closing Date of the Agreement, Anheuser-Busch created, marketed, and sold two competitive flavored alcoholic seltzer products, Bon & Viv and Natural Light Hard Seltzer, without written authorization from Plaintiff.

136.   For months after Bon & Viv's inception, Anheuser-Busch was the sole owner of the Bon & Viv trademark. Indeed, the original announcement of Bon & Viv to distributors states that it was distributed by Anheuser-Busch and Beyond Beer—the Boathouse name is nowhere to be found.

137.   In an attempt to circumvent its obligations under Section 2.10(iii) of the Agreement, on August 1, 2019, Anheuser-Busch transferred the trademark and assignment of interest of Bon & Viv to Boathouse without notice to Plaintiff or Sellers.

138.   Anheuser-Busch's belated transfer and assignment of the Bon & Viv trademark was a tactical ploy to lower the earnout amount due to Plaintiff under the Agreement.

39

139.   Anheuser-Busch's categorization of Bon & Viv products as Company products, in direct contradiction to the spirit of the parties' Agreement and the reasonable expectations of the parties, and its corresponding exclusion of sales of its other competitive hard seltzer products in the earnout paid to Plaintiff, further demonstrates its strategic manipulation to deprive Plaintiff of its full benefit owed under the Agreement.

140.   When Shields raised the issue of how Bon & Viv should have been properly categorized for the purpose of the earnout provision of the Agreement, Anheuser-Busch made highly misleading statements to try to deflect attention from its efforts to manipulate the earnout payment. Anheuser-Busch claimed that Boathouse was responsible for "production and shipment" of Bon & Viv, when in fact Anheuser-Busch produced Bon & Viv at its brewing facilities and shipped it using its own distribution network.

141.   Anheuser-Busch then cited Boathouse's ownership of the Bon & Viv trademark but withheld the fact that it had originally applied for the trademark for itself; and that only later did Anheuser-Busch transfer the Bon & Viv trademark to Boathouse, in an obvious effort to manipulate the earnout.

142.   Anheuser-Busch's actions as set forth herein constitute acts of bad faith.

143.   As a result of Anheuser-Busch's bad-faith acts, Plaintiff has been deprived of its full benefits owed under the Agreement.

## COUNT FOUR

## CONNECTICUT UNFAIR TRADE PRACTICES ACT

144.   Plaintiff incorporates the allegations set forth in Paragraphs 1 through 112, and 123 through 143.

40

145.    Anheuser-Busch engaged in multiple unfair and deceptive acts, including (but not limited to) manipulating the ownership of the Bon & Viv word mark; concealing the original ownership of the Bon & Viv word mark; and falsely claiming that Boathouse produced and shipped Bon & Viv—all in support of its scheme to deprive Plaintiff of the actual earnout amount owed under Section 2.10(a)(iii) of the Agreement.

146.    At all times relevant hereto, Anheuser-Busch was engaged in commerce within the meaning of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110(b) *et seq*.

147.    By virtue of the foregoing allegations, Anheuser-Busch engaged in unfair trade practices and deceptive acts in the conduct of trade and commerce in violation of CUTPA.

148.    Plaintiff and Sellers suffered ascertainable harm as a result of Anheuser-Busch's unfair trade practices and deceptive acts in the conduct of trade and commerce. As a consequence of the aforementioned harm, Plaintiff is entitled to recover monetary and punitive damages under Conn. Gen. Stat. § 42-110g(a), and reasonable costs and attorneys' fees under Conn. Gen. Stat. § 42-110(g)(d).

149.    A copy of this Complaint is being mailed to the Attorney General and the Commissioner of Consumer Protection of the State of Connecticut pursuant to Conn. Gen. Stat. § 42-110(g)(c).

## COUNT FIVE

### CONTRACTUAL INDEMNIFICATION

150.    Plaintiff incorporates the allegations set forth in Paragraphs 1 through 112, and 123 through 143.

41

151.    Section 10.3 of the Agreement, "Indemnification and Payment of Losses by

Buyer," provides:

> From and after the Closing and subject to the provisions of this <u>Article
> 10</u>, Buyer shall indemnify, defend, and hold each Seller Indemnified
> Person harmless against all Losses sustained or incurred by any Seller
> Indemnified Person arising from . . . (b) the breach by Buyer of, or
> failure of Buyer to comply with any of the covenants or obligations
> under this Agreement to be performed by Buyer.

152.    The Agreement defines "Losses" as "all losses, liabilities, claims, damages,

settlement payments, and expenses (including the costs of investigation, defense and reasonable

attorneys' fees)."

153.    Plaintiff suffered "Losses" under the Agreement, including but not limited to

damages from Anheuser-Busch's manipulation of the earnout provision and its underpayment of

the earnout by tens of millions of dollars. Plaintiff is entitled to indemnification from Anheuser-

Busch for such Losses pursuant to Section 10.3 of the Agreement.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the following relief:

      a.  An order granting the declaratory judgment requested above (in Count One);

      b.  Compensatory Damages (in an amount exceeding fifteen thousand dollars) (as to Counts Two, Three, Four, and Five);

      c.  Punitive Damages (as to Count Four);

      d.  Attorneys' Fees and Costs (as to Counts Four and Five);

      e.  Pre- and Post-judgment Interest; and

      f.  Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial as to all claims triable by jury.

Dated: New York, New York
March 8, 2022

Respectfully submitted,

**ROCHE FREEDMAN LLP**

*Amos Friedland*

Amos Friedland (Juris No. 429133)
Edward Normand (Pro hac vice forthcoming)
Nathan Holcomb (Pro hac vice forthcoming)
Eric Rosen (Pro hac vice forthcoming)
Jordana Haviv (Pro hac vice forthcoming)
Daniel Stone (Pro hac vice forthcoming)
Maya Jumper (Pro hac vice forthcoming)
99 Park Avenue, Suite 1910
New York, New York 10016
Tel. (646) 970-7519
afriedland@rochefreedman.com

**MOLOLAMKEN LLP**

*Benoit Quarmby*

Benoit Quarmby (Pro hac vice forthcoming)
430 Park Avenue
New York, New York 10022
Tel. (212) 607-8157
bquarmby@mololamken.com

## CERTIFICATION

Pursuant to Connecticut Practice Book Sec. 17-56(b), I hereby certify that all interested persons have been notified of this Action by way of U.S. mail directed to the last known address of each person or entity, and notice to Seller Representative in accordance with Section 11.1 of the Agreement.

Dated: March 8, 2022

Amos Friedland
Amos Friedland

45